**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Douglas Clark Elmore, | ) | No. CV-10-1517-PHX-LOA |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff seeks judicial review of the Commissioner of Social Security's denial of his application for disability insurance benefits. 42 U.S.C. § 405(g). The parties, who have consented to proceed before a United States Magistrate Judge, have filed briefs in accordance with Local Rule of Civil Procedure 16.1. (Docs. 8, 11)  After review of the record, briefing, and the applicable law, the decision of the Commissioner is affirmed.

**I. Procedural Background**

On August 31, 2006, Plaintiff filed a claim for Disability Insurance Benefits ("DIB"), alleging disability beginning February 23, 2005. (Tr. 46, 82)  The claim was denied initially and upon reconsideration. (Tr. 46)  After conducting a hearing, on March 17, 2008, the administrative law judge[1] ("ALJ") found Plaintiff not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 54)  This decision became the final decision of the Commissioner of Social Security when the Social Security Appeals Council denied

_____

[1] The ALJ was Ronald C. Dickinson.

Plaintiff's request for review. (Tr. 1-3) Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II. Applicable Legal Standards

### A. Sequential Evaluation Process

A "disability" is defined by the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). An individual is disabled if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A). The claimant bears the initial burden of proving disability. 42 U.S.C. § 423 (d)(5); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). If the claimant shows he is unable to perform past relevant work, the burden shifts to the Commissioner to demonstrate that the claimant "can perform other substantial gainful work that exists in the national economy." *Takcett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

An ALJ determines an applicant's eligibility for DIB by following the five steps listed below:

(1) determine whether the applicant is engaged in "substantial gainful activity";

(2) determine whether the applicant has a "medically severe impairment or combination of impairments";

(3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4) if the applicant's impairment does not equal one of the "listed impairments," determine whether the applicant has the residual functional capacity to perform his or her past relevant work;

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant "is able to perform other work in the national economy in view of his [or her] age, education, and work experience."

*Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)). At the fifth step, the burden of proof shifts to the Commissioner. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).

Applying the five-step analysis, the ALJ found that: (1) Plaintiff has not engaged in substantial gainful activity since February 23, 2005; (2) Plaintiff has a severe impairment; and (3) Plaintiff's impairment does not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 47-48) At steps four and five, the ALJ found that, although Plaintiff does not retain the residual functional capacity to return to his past relevant work, he has the residual functional capacity to perform other jobs existing in significant numbers in the national economy. (Tr. 48-49) Thus, the ALJ concluded that Plaintiff was not disabled under the Social Security Act. (Tr. 54)

**B. Standard of Review**

A district court must affirm the Commissioner's findings if they are supported by substantial evidence and are free from legal error. *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (*per curiam*); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). In determining whether substantial evidence supports a decision, the court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Sandgathe,* 108 F.3d at 980 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995)).

The ALJ is responsible for resolving conflicts, determining credibility, and resolving ambiguities. *Andrews*, 53 F.3d 1035 at 1039; *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If sufficient evidence supports the ALJ's determination, the court cannot substitute its own determination. *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Moreover, if a reasonable mind could understand the evidence to support either outcome, the court must defer to the ALJ's decision. *Richardson v. Sullivan*, 981 F.2d 1016 (9th Cir. 1992) (citations omitted).

If on the record as a whole, substantial evidence supports the ALJ's decision and it is free from legal error, this court must affirm it. *See Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C.A. § 405(g). Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that "the ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).

## III. Facts

### A. Plaintiff's Background

Plaintiff was born on December 6, 1960 and was 47 years old at the time of the administrative hearing. (Tr. 22)  He has an eleventh grade education. (Tr. 23)  He worked at a grocery store warehouse for 25 years prior to the disability onset date. His work included driving a standup forklift carrying loads up to 100 pounds.  (Tr. 102)

### B. Medical Evidence Regarding Physical Impairments

As the ALJ noted, Plaintiff suffers from degenerative disc disease of the cervical and lumbar spine with spondylosis, right rotator cuff tear, plantar fasciitis, and obesity. (Tr. 48) Plaintiff received the following medical treatment and examinations related to these conditions.

#### 1. Misty Johnson, RN, FNP

In 2005, Plaintiff saw Misty Johnson, RN, who ordered various diagnostic tests pertaining to Plaintiff's complaints of pain.[2]  A February 4, 2005 x-ray of Plaintiff's left foot showed degenerative changes with some hypertrophic changes of the talonavicular and navicular cuneiform articulations as well as narrowing of the tarsometatarsal articulations.  (Tr. 183)  A February 4, 2005 x-ray of the lumbar spine showed "fairly significant degenerative hypertrophic changes lower thoracic spine" as well as facet sclerosis and hypertrophy at L5-S1. (Tr. 198)  An x-ray of the cervical spine was unrevealing. (Tr. 199)  A chest x-ray showed

---

[2] Ms. Johnson is a Registered Nurse and a certified Family Nurse Practitioner. Therefore, the Court refers to her as Ms. Johnson, not Dr. Johnson.

"anterior wedging of multiple thoracic vertebra associated with anterior endplate hypertrophic spurring." (Tr. 200)   A February 24, 2005 MRI of the left ankle showed plantar fasciitis and early degenerative joint disease. (Tr. 180)  An MRI of the lumbar spine showed an annular disc bulge at L5-S1 without nerve root encroachment. (Tr. 181)  A March 10, 2005 MRI showed a lesion of the L3 vertebral body "of uncertain clinical significance." (Tr. 177)  A March 15, 2005 x-ray of Plaintiff's right shoulder revealed a rotator cuff tear. (Tr. 166)

As part of Plaintiff's application for disability benefits, on March 22, 2005, Ms. Johnson completed a "Certification of Health Care Provider" form in which she concluded that Plaintiff "is currently unable to work." (Tr. 187-189) She opined that Plaintiff "may be permanently disabled." (Tr. 187)  On May 20, 2005, Ms. Johnson referred Plaintiff to "Dr. David Greene at Sonoran Spine Center for a consultation regarding his back lesion." (Tr. 159) On July 19, 2005, Ms. Johnson gave Plaintiff a note for his employer, stating that he should "continue with his ability until we can figure out the treatment plan." (Tr. 158)  A month later, Ms. Johnson gave Plaintiff a note stating that he should remain out of work until he followed up with specialists regarding his plantar fasciitis and spinal lesion. (Tr. 157)  On August 26, 2005, Ms. Johnson noted "severe back pain, severe [right] shoulder pain, numbness & tingling of the [left] leg, decreased range of motion [right] shoulder, severe foot pain."  (Tr. 263)

## 2. Dr. David Greene, M.D.

On referral from Ms. Johnson, Plaintiff saw Dr. Greene on September 13, 2005 for an "orthopedic spinal consultation." (Tr. 225)  Dr. Greene found no tenderness to palpation in Plaintiff's neck or lower back.  He also found that Plaintiff could heel and toe walk normally, "has normal motor and sensory examination in his upper and lower extremities, negative Hoffman's, negative upper motor neuron signs, negative straight leg test." (Tr. 225) He also noted full and painless hip range of motion. (*Id*.)  Dr. Greene noted Plaintiff's report that his pain worsened when sitting standing, walking, driving, lifting, bending or sitting.  (Tr. 225) Dr. Greene discussed imaging studies which showed spondylosis, osteophytosis and degenerative disc disease. (Tr. 226) Dr. Greene concluded that Plaintiff had not had "sufficient conservative treatment" and recommended treatment with a physiatrist and physical therapy.

1   (Tr. 226)

2   **3. Dr. J. Carvel Jackson, D.O. and Kurt Giles, PA-C[3]**

3        Ms. Johnson also referred Plaintiff to Dr. J. Carvel Jackson, D.O. (Tr. 208)  In

4 October 2005, Dr. Jackson, along with his Physician's Assistant, Kurt Giles, examined Plaintiff.

5 They diagnosed Plaintiff with a right shoulder rotator cuff tear, lumbosacral disc disorder,

6 lumbosacral degenerative disc disease, cervical spinal pain, and bilateral lower extremity pain

7 and paresthesia. (Tr. 218)  On November 29, 2005, elector diagnostic testing showed plantar

8 entrapment neuropathy and evidence of L5-S1 radiculopathy. (Tr. 210) Dr. Jackson concluded

9 that said Plaintiff was "disabled from returning to his previous employment as a

10 wharehousemen with Bashas.  A formal disability evaluation may be in order in that the patient

11 also experiences chronic right shoulder dislocations and right thigh pain/parathesias to Meralgia

12 Paresthetica." (Tr. 210)

13        Plaintiff saw Dr. Jackson's P.A., Kurt Giles, in January and February of 2006.  (Tr.

14 206-07) During the February visit, Mr. Giles noted that Plaintiff was "doing fairly well." (Tr.

15 206) On a Medical Questionnaire completed for Standard Insurance Company in 2006, Dr.

16 Jackson noted that Plaintiff could sit, stand, and walk, "1-4" hours a day.[4]  (Tr. 202)  Dr.

17 Jackson noted low back pain resulted in increased "difficulty

18 sitting/standing/bending/stooping," with decreased range of motion. (Tr. 202) He further noted

19 that cervical pain resulted in increased "difficulty sitting/standing," and a decreased range of

20 motion. (*Id.*)  Dr. Jackson concluded that Plaintiff's condition was "permanent at this time,"

21 and that his "anticipated return to work date was uncertain." (Tr. 203)

22        On June 25, 2007, Dr. Jackson opined there were no assistive devices or modifi-

23 cations that could facilitate a return to work for Plaintiff and that he was "permanently

24

---

25      [3] Mr. Giles, a Physician's Assistant, is referred to as Mr. Giles.

26      [4] The first page of the form, completed by Plaintiff, is dated April 6, 2006.  However,
27 the last page of the form which is signed by Dr. Jackson, is dated "June 26, 2005."  The Court
assumes that "2005" is a typographical error which should read June 26, 2006, because Dr.
28 Jackson did not begin treating Plaintiff until October 2005.  (Tr. 203, 218)

disabled." (Tr. 268)

**4. Dr. Syed Masood, M.D. - State Agency Physician**

On December 5, 2006, Dr. Syed Masood, M.D., conducted a consultative examination on behalf of the agency. (Tr. 228-30) Dr. Masood performed a physical examination and reviewed Plaintiff's medical history. (Tr. 228-229) Dr. Masood noted that Plaintiff used a "stick" to walk and had trouble heel and toe walking because of his back pain. (Tr. 229) Dr. Masood found tenderness to palpation of the spine in the cervical and lumbosacral areas. Dr. Masood also noted a minimally reduced range of motion in the cervical spine, and that Plaintiff had diminished movement of his right shoulder. (Tr. 229) Straight leg raising was normal. Plaintiff had intact sensations and Dr. Masood found that Plaintiff's plantar fasciitis "appeared to be improving." (Tr. 229) Dr. Masood concluded that because of Plaintiff's "significant number of chronic diseases . . .[he] will have difficulty in doing any meaningful exertional activity and it seemed that he is significantly impaired." (Tr. 229)

**5. Dr. Jerry Dodson, M.D. - State Agency Physician**

On January 5, 2007, Dr. Jerry L. Dodson, M.D., conducted a physical residual functional capacity assessment on behalf of the State agency. (Tr. 232-239) Dr. Dodson found Plaintiff's reports of his symptoms "less than credible" because the "degree of [symptoms] are disproportionate to the expected severity based on evidence in file . . . ." (Tr. 237) He opined that the "CE" doctor's [Dr. Masood] notation the Plaintiff is unable to do exertional activities "should not be adopted" because the "function reported by [Plaintiff] is disproportionate to restrictions." (Tr. 238) Dr. Dodson concluded that Plaintiff was able to stand "at least 2 hours during an 8-hour workday; and to sit about six hours in an 8-hour day." (Tr. 233)

**6. Dr. John Fahlberg, M.D. - State Agency Physician**

On May 8, 2007, Dr. John Fahlberg, M.D., a state agency physician, completed a physical residual functional capacity assessment. (Tr. 240-247) Dr. Fahlberg found Plaintiff "partially credible," and noted that the "degree of objective findings [was] not consistent with allegation of disability." (Tr. 245) Dr. Fahlberg concluded that Plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk about 6 hours in an 8-

hour workday; sit about 6 hours in an 8-hour work day; and was unlimited in his ability to push/pull. (Tr. 241)

### D. Plaintiff's Written Reports

The record includes a Disability Report, Form SSA-3368, that is not signed or dated. (Doc. 100-107) It identifies Plaintiff's conditions that limit his ability to work as a torn right rotator cuff, a spine lesion, bulging disc, degenerative disc disease, and plantar fasciitis. (Tr. 101) The form also notes that Plaintiff's shoulder dislocates and he is unable to stay in a stationary position for more than ten or fifteen minutes. (Tr. 101)

Plaintiff completed a Function Report on September 28, 2006. (Tr. 108-115) He reported that during a typical day he rests and watches television, "straightens [the] house for a few minutes at a time," takes naps after lunch, pays bills, goes to food banks "when possible," and does yard work for ten to fifteen minutes at a time. (Tr. 108) He also reported that his "wife is disabled," and that he helps get her medication, helps her get dressed her, and helps her make meals. (Tr. 109) Plaintiff stated that his is unable to play sports with his sons, and can no longer do wood working. (Tr. 109, 115) Plaintiff further stated that he only sleeps for a "2-3 hrs at a time." (Tr. 109-10)

## IV. Hearing Testimony

Plaintiff and vocational expert, Sandra K. Richter, testified at the April 28, 2008 administrative hearing. (Tr. 18-39) Plaintiff testified that his lower back pain was his worst problem. (Tr. 24) He also testified that he has neck pain, right shoulder pain, severe pain in his left foot, numbness in his left thigh and three left toes on his left foot, and daily headaches. (Tr. 25) To relieve his pain, Plaintiff lays down four hours during a typical eight-hour day. (Tr. 31) Plaintiff further testified that, when he is not lying down or trying to walk, he reclines in a chair. (Tr. 29) Plaintiff testified that he was able to stand or sit for 15 minutes at a time. (Tr. 28-29) Plaintiff explained that he had not received treatment for his shoulder or back since he lost his insurance in February 2006. (Tr. 30-32)

Vocational expert, Sandra Richter, classified Plaintiff's past relevant work as a material handler as heavy, semi-skilled work. (Tr. 33) She classified his past relevant work as

a forklift operator as medium, semi-skilled work. (Tr. 33-34) The ALJ posed the following

hypothetical to Ms. Richter:

> Well, let's assume that we have a person . . . who is able to do light extertional
> level work . . . And then the job would be unskilled . . . And then there would
> be postural restrictions. So there would be no crawling, or crouching, or
> climbing, or squatting, or kneeling. Lower extremity limitations, so there [would]
> be no use of the legs or feet for pushing or pulling of foot or leg controls. And
> there would be upper extremity limitations, so there would be no work above
> shoulder level. And the job would allow a person to alternate between sitting
> and standing, so there [would] be a sit-stand option.

(Tr. 35) Ms. Richter responded that a person with these limitations could perform light,

unskilled jobs including parking lot attendant, cashier, and "unskilled inspector positions." (Tr.

35-36) She "eroded" the number of such positions "to one third of the total numbers to allow

for the sit-stand option." (Tr. 35-36) Ms. Richter further testified that these jobs do not allow

for a worker to lay down. (Tr. 36) Ms. Richter agreed that, "crediting [Plaintiff's] testimony

[that he has to lay down frequently throughout the day] no work of any kind could be performed

on a sustained basis." (Tr. 38)

## V. The ALJ's Decision

On March 17, 2008, the ALJ denied Plaintiff's application for disability benefits after

applying the sequential evaluation process, 20 C.F.R. § 404.1520(a)(4). (Tr. 46-54) At the first

step, the ALJ found that Plaintiff had not performed any substantial gainful activity since the

disability onset date. (Tr. 48) At the second step, the ALJ found that when "considered in

combination: degenerative disc disease of the cervical and lumbar spine with spondylosis, right

rotator cuff tear, plantar fasciitis, and obesity," were severe impairments. (Tr. 48) At the third

step, the ALJ found the severity of Plaintiff's impairment not to meet the criteria of any

impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 49) At the fourth step,

the ALJ found Plaintiff was "unable to perform any of his past relevant work." (Tr. 52) At the

fifth step, the ALJ found Plaintiff had "the residual functional capacity to perform light

unskilled work with a sit-stand option and prohibitions on crawling, crouching, climbing,

squatting, and/or kneeling, no use of his lower extremities for pushing or pulling, and no use

of his upper extremities for work above the shoulder level." (Tr. 49) Based on the testimony

of the vocational expert, and considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that Plaintiff could make "a successful adjustment to work in the jobs that exist in significant numbers in the national economy." (Tr. 53)

In reaching this conclusion, the ALJ found Plaintiff's symptom testimony less than credible, because his reported limitations were unsupported by his activities and the medical evidence. (Tr. 49-50) The ALJ determined that Plaintiff "exaggerated his limitations and his symptoms." (Tr. 50) The ALJ found that "Dr. Greene is well qualified to diagnose orthopedic impairments and recommend limitations on a patient's residual functional capacity, but he did not impose any limitations on the claimant." (Tr. 50) The ALJ assigned "significant evidentiary weight [to] Dr. Greene's findings and opinion regarding the absence of functional limitations." (Tr. 50) The ALJ further noted that Plaintiff had not reported any limitations in September 2006 when he completed SSA Forms 3367, 3368 or 3341. (Tr. 50)

The ALJ gave little weight to the statements of Ms. Johnson and Mr. Giles. He explained 20 C.F.R. §404.1513 (d) does not include nurse practitioner or physician's assistant as an "acceptable medical source. As such, any comment, statement, or opinion which [Ms. Johnson] has made is assigned the same evidentiary weight as . . . other laymen." (Tr. 50) The ALJ also assigned Dr. Jackson's opinions little weight because, although he is an acceptable medical source, Dr. Jackson concurred with Mr. Giles' initial evaluation [on October 31, 2005] and "no assessment of the claimant's residual functional capacity was made at that time." (Tr. 50; 216-19) The ALJ also assigned little weight to Dr. Masood's evaluation. (Tr. 51) However, the ALJ noted that Dr. Masood "reported a number of circumstances (such as using a cane when no cane was prescribed and failing to walk heel to toe and the complete absence of muscle atrophy, loss of motor function, spasm, *et cetera*, all signs of severe chronic long-term pain) which tend to indicate that the claimant has exaggerated his alleged symptoms of pain." (Tr. 51-52)

## VI. Analysis

In support of his request for review of his claim for disability benefits, Plaintiff

presents six claims.

1. The ALJ erred by assigning "significant evidentiary weight" to a non-existent medical opinion by Dr. Greene regarding Plaintiff's functional limitations.

2. The ALJ erred by assessing Plaintiff's residual functional capacity without any basis in the record, and by denying due process when failing to provide an individualized determination of Plaintiff's condition.

3. The ALJ erred by rejecting Plaintiff's symptom testimony in absence of clear and convincing reasons for doing so.

4. The ALJ erred by rejecting the assessment of examining physician, Syed Masood, M.D., without providing any reasons for doing so.

5. The ALJ erred by automatically according statements of a physician's assistant and treating nurse practitioner the same evidentiary weight as lay evidence.

6. This Court should remand for determination of disability benefits.

Defendant opposes Plaintiff's assertions. The Court will address Plaintiff's claims below.

**A. Dr. Greene's opinion**

As discussed below, the ALJ did not err by concluding that Dr. Greene did not impose any limitations on Plaintiff's functional abilities. In the absence of specific limitations in Dr. Greene's treatment notes, the ALJ found that Dr. Greene "did not impose any limitations on the claimant." (Tr. 50) Plaintiff argues that Dr. Greene's silence regarding Plaintiff's functional capacity does not constitute substantial evidence in support of the ALJ's functional capacity determination. Plaintiff cites *Hutsell*, where the Eighth Circuit stated that:

> A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment.

*Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001)).

Here, the record reflects Ms. Johnson referred Plaintiff to Dr. Greene, an orthopedist, for an evaluation of his back pain. She instructed Plaintiff to remain out of work until he had consulted Dr. Greene regarding his back pain, and a podiatrist regarding his plantar fasciitis. (Tr. 157-59) The ALJ noted that Dr. Greene examined Plaintiff and concluded that "while [Plaintiff] had spondylosis of the cervical and lumbar spine and degenerative disc disease, he . . . found no evidence of radicular pathology or any signs of severe long-term chronic pain as would normally be expected if the impairments were as severe as the claimant alleged." (Tr. 50) The ALJ further noted Dr. Greene's findings that Plaintiff could "walk heel and toe normally, has normal motor and sensory findings in both his upper and lower extremities on examination, produced a negative Hoffman's test and was negative as regards to upper motor neuron signs." (Tr. 50) Additionally, the ALJ noted that Dr. Greene "reported negative results from a straight leg raising test, which should not have happened if the claimant were truly experiencing the lower back pain he claimed." (*Id*.) The ALJ noted the absence of limitations on Plaintiff's residual functional capacity in Dr. Greene's report. (*Id*.) After evaluating Plaintiff, Dr. Greene concluded that Plaintiff had "not had sufficient conservative treatment outside of the chiropractic modalities." (Tr. 225-26) He recommended that Plaintiff seek treatment from a physiatrist and a physical therapist. (*Id*.)

Plaintiff argues that the ALJ improperly considered Dr. Greene's failure to impose any restrictions on Plaintiff when assessing his functional capacity. However, in view of Ms. Johnson's notation that Plaintiff should remain out of work until seeing Dr. Greene and a podiatrist, it was reasonable for the ALJ to note that Dr. Greene did not impose any restrictions on Plaintiff. As Plaintiff notes, when a doctor's treatment notes are silent regarding a claimant's functional capacity, courts find it significant that the doctor did not release the claimant from treatment. *Hutsell*, 259 F.3d at 712. Here, Dr. Greene found that Plaintiff "has not had sufficient conservative treatment outside chiropractic modalities," and stated that he would like Plaintiff to see a "physiatrist for further management and also physical therapy." (Tr. 226) Dr. Greene did not schedule further appointments with Plaintiff and merely stated that he would see

Plaintiff again if his treatment with a physiatrist and physical therapist failed. (*Id.*) It is reasonable to conclude that Dr. Greene had released Plaintiff from further treatment with Dr. Greene. To the extent Dr. Greene's statements are "susceptible to more than one rational interpretation," the ALJ's decision must be upheld. *Sandgathe*, 108 F.3d at 980.

**B. Assessment of Residual Functional Capacity and Due Process**

Plaintiff argues that the ALJ erred in assessing Plaintiff's residual functional capacity ("RFC") and that he was denied due process. As discussed below, the ALJ properly assessed Plaintiff's RFC and made an individualized determination regarding Plaintiff's claim for disability benefits.

A claimant's residual functional capacity is the most a claimant can do, given his impairments and limitations. Social Security Ruling ("SSR") 96-8p. The ALJ is responsible for determining a claimant's RFC. 20 C.F.R. § 404.1546. In assessing a claimant's residual functional capacity, the ALJ must consider the record as a whole, and must explain his analysis of the medical evidence and testimony. SSR 96-5p. No doctor's opinion is conclusive as to this issue. *Id.* When reviewing the ALJ's analysis, the issues are whether the ALJ applied the proper legal standards, and whether the assessment is supported by substantial evidence.

Plaintiff argues that the ALJ's determination of his RFC was erroneous because the ALJ did not describe the evidence in support of his conclusion that Plaintiff could perform light work. This Court will affirm the ALJ's determination of Plaintiff's RFC if the ALJ applied the proper legal standard and his decision is supported by substantial evidence. *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). In making his RFC determination, the ALJ provided a narrative discussion of the specific medical facts and non-medical evidence in support of his determination. (Tr. 49-52) The ALJ found that Dr. Greene, an orthopedic specialist, concluded that "while [Plaintiff] had spondylosis of the cervical and lumbar spine and degenerative disc disease, he . . . found no evidence of radicular pathology or any signs of severe long-term chronic pain as would normally be expected if the impairments

were as severe as the claimant alleged." (Tr. 50)  The ALJ further noted Dr. Greene's findings that Plaintiff could "walk heel and toe normally, has normal motor and sensory findings in both his upper and lower extremities on examination, produced a negative Hoffman's test and was negative as regards to upper motor neuron signs." (Tr. 50)  Additionally, the ALJ noted that Dr. Greene "reported negative results from a straight leg raising test, which should not have happened if the claimant were truly experiencing the lower back pain he claimed." (*Id*.)  The ALJ noted the absence of limitations on Plaintiff's residual functional capacity in Dr. Greene's report. (*Id*.)

In further support of his RFC determination, the ALJ noted that state agency Dr. Masood "reported a number of circumstances (such as using a cane when no cane was prescribed and failing to walk heel to toe and the complete absence of muscle atrophy, loss of motor function, spasm, *et cetera*, all signs of severe chronic long-term pain) which tend to indicate the claimant has exaggerated his symptoms." (Tr. 51-52)

In view of the medical evidence, the ALJ found Plaintiff had the "residual functional capacity to perform light, unskilled work with a sit-stand option and prohibitions on crawling, crouching, climbing, squatting, and/or kneeling, with no use of his lower extremities for pushing or pulling, and no use of upper extremities for work above shoulder level." (Tr. 52)

Plaintiff argues that ALJ Dickinson uses nearly identical limitations in cases where benefits are denied. In support of that assertion, Plaintiff provides several hypothetical questions posed by ALJ Dickinson at various administrative hearings between 2005 and 2008.  (Doc. 22, Appendix)  As Defendant notes, the hypothetical questions in the appendix do not contain all the same limitations, and are not all identical to the ALJ's residual functional capacity finding in this case.   For example, some do not include sit/stand options (doc. 22-1 at 1, example 2), others are not limited to unskilled work (doc. 22-1 at 1, example 3), and others involve limitations on activities - such as interaction with the public - that are not involved in this case (doc. 22-1 at 4, example 3). Thus, although ALJ Dickinson may use similar hypothetical

questions, the differences between the examples submitted by Plaintiff and the hypothetical questions posed to the vocational expert in this case indicate that the ALJ made an individualized determination in Plaintiff's case.

The ALJ made an individualized determination and did err in assessing Plaintiff's residual functional capacity. Social Security Ruling 96-8p provides that "[t]he RFC assessment must include narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184 at * 2 (1996).

Here, the ALJ described the medical evidence that supported his conclusion that Plaintiff had the residual functional capacity to perform light work. The ALJ noted that he assigned "significant evidentiary weight to Dr. Greene's findings and opinions regarding the absence of functional limitations." (Tr. 50) As discussed above, although Dr. Greene did not specifically state that Plaintiff had no functional limitations, he did not include any limitations on Plaintiff's activities in his report. His findings based on his physical examination of Plaintiff, however, revealed that Plaintiff could "walk heel and toe normally, has normal motor and sensory findings in both his upper and lower extremities on examination, produced a negative Hoffman's test and was negative as regards to upper motor neuron signs." (Tr. 50) Dr. Greene also "reported negative results from a straight leg raising test, which should not have happened if the claimant were truly experiencing the lower back pain he claimed." (*Id.*) Dr. Greene noted that Plaintiff had a full, painless range of motion in his hips, and had no tenderness to palpation in his neck and low back. (Tr. 225) Dr. Green further noted that Plaintiff had "not had sufficient conservative treatment," and recommended that he see a physiatrist and physical therapist for further treatment. (Tr. 226) Contrary to Plaintiff's argument, Dr. Greene did not indicate that he would continue to treat Plaintiff. Rather, he simply stated that he would see Plaintiff "back if [treatment with a physiatrist or physical therapist] fails." (Tr. 226) The ALJ's interpretation, based on Dr. Greene's findings, that Dr. Greene did not impose any limitations on Plaintiff's

residual functional capacity, is a rational interpretation of the record. To the extent Dr. Greene's statements are "susceptible to more than one rational interpretation," the ALJ's decision must be upheld. *Sandgathe*, 108 F.3d at 980.

Additionally, the ALJ's RFC determination is consistent with Ms. Johnson's opinion that Plaintiff could not lift more than 20 pounds, stand for "long periods," or engage in "over the head movements." (Tr. 52, 189) The ALJ's RFC determination also took into account Plaintiff's inability to perform activities such as squatting, by finding "prohibitions on crawling, crouching, climbing, squatting, and/or kneeling, with no use of his lower extremities for pushing or pulling . . . ." (Tr. 52)

The ALJ's RFC determination is free from harmful legal error and is supported by substantial evidence, thus, the Court will affirm that finding. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

**C. Plaintiff's Symptom Testimony**

Plaintiff next argues that the ALJ erred in discounting his symptom testimony. (Doc. 22 at 11-13)  As discussed below, the ALJ did not err in this regard.

In deciding whether to accept a claimant's subjective symptom testimony regarding the severity of symptoms, the court must determine whether the claimant has produced objective medical evidence of the impairments at issue. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160-61 (9th Cir. 2008). Next, the claimant must show that his medically determinable impairments could reasonably be expected to produce some degree of the symptoms of which the claimant complained. *Smolen*, 80 F.3d at 1282.

Here, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to produce some of the symptoms alleged." (Tr. 52)  Thus, because the ALJ found no evidence of malingering, he was permitted to disregard Plaintiff's testimony about the symptoms' severity "only by offering specific, clear, and convincing reasons for doing

so." *Id.* at 1281. A credibility finding must be based on "clear and convincing reasons." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks omitted). "To determine whether the claimant's testimony regarding the severity of his symptoms is credible, the ALJ may consider the following: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's work record, and the observations of treating and examining physicians and other third parties regarding "the nature, onset, duration and frequency of claimant's symptoms, and precipitating and aggravating factors, functional restrictions caused by the symptoms, and the claimant's daily activities." *Id.* (citing SSR 88-13) (footnote omitted).

Here, the ALJ found that Plaintiff was not credibly reporting the severity of his symptoms. The ALJ noted that Plaintiff's allegations of the severity of his limitations were not supported by the medical evidence. (Tr. 52) "Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle*, 533 F.3d at 1161 (citing *Johnson*, 60 F.3d at 1434). This finding is supported by Dr. Greene's finding that Plaintiff could "heel and toe walk normally, had normal motor and sensory findings in both is upper and lower extremities upon examination, produced a negative Hoffman's test, produced negative results from a straight leg test, had full and painless range of motion in his hips." (Tr. 225-26)

The ALJ also reasonably found that Plaintiff's daily activities were inconsistent with his claims of disabling pain. An ALJ may properly infer from Plaintiff's daily activities that he is not as limited as he claims. *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (Plaintiff's active lifestyle, which included cleaning, cooking, walking her dogs, and driving to appointments, did not support her allegations of disabling respiratory illness).

Here, Plaintiff stated that he prepares meals, straightens the house, takes care of family pets, cares for his disabled wife, pays bills, performs some yard work, drives, grocery shops, goes to the bank, and helps his children with homework. (Tr. 108-111) Even if Plaintiff did not perform daily activities for a substantial period of time, the ALJ properly considered those activities in finding that Plaintiff's subjective complaints were not credible to the extent alleged. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (stating that "[i]t is true that Rollins's testimony was somewhat equivocal about how regularly she was able to keep up with all of these activities, and the ALJ's interpretation of her testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second guess it.").

The ALJ also noted that, despite his allegations of disabling pain, Plaintiff demonstrated normal muscle strength and sensation, with no evidence of muscle atrophy. (Tr. 49, 51-52, 225, 229); *Bray*, 554 F.3d at 1227 (finding an ALJ properly considered the objective medical evidence in assessing credibility). The ALJ also noted that, although Plaintiff used a cane, it had not been prescribed by a doctor. *Thomas v. Barnhart*, 278 F.3d 947, 959-60 (9th Cir. 2002) (finding ALJ reasonably discounted a claimant's assertion that she needed a cane where the evidence did not show the cane had been prescribed by a doctor.).

Plaintiff argues that the ALJ erred in stating that Plaintiff had not reported limitations in SSA Forms 3367, 3368, or 3441 (Tr. 90-93, 100-07, 134-40). First, Form 3367 includes only personal information, and was completed by M. Vanderheyd, not Plaintiff, who noted that he had "no contact with claimant." (Tr. 116-118) Thus, Form 3367 was not a document which would have included Plaintiff's limitations.

Second, the ALJ incorrectly wrote that Form 3368 does not include any limitations. Rather, on that form, Plaintiff states that he could not "stay in a stationary position" for more than 10-15 minutes, and that his shoulder dislocates. (Tr. 101) Plaintiff also indicated that he stopped working "because of [his] disability." (*Id.*) Finally, on Form 3341, Plaintiff reported

leg numbness and shoulder dislocation. (Tr. 122) He reported only being able to walk a short distance before sitting down and not being able to remain still. (*Id*.) He also reported an inability to wash his feet or clip his toe nails because of his back pain, and that he has difficulty washing his hair because of his shoulder. (Tr. 125)

Although the ALJ misstated the information Plaintiff provided on several forms, this error does not infect the ALJ's credibility determination because it is based on other valid reasons which are supported by the record. *Carmickle*, 533 F.3d at 1162-63 (finding harmless error where the ALJ gave some erroneous reasons, but other legally valid ones in support of credibility determination). In sum, the ALJ articulated clear and convincing reasons for discounting Plaintiff's subjective complaints regarding the severity of his symptoms. The ALJ's determination of Plaintiff's credibility is affirmed.

**D. Rejection of Dr. Masood's Assessment**

Plaintiff next argues that the ALJ erred in evaluating Dr. Masood's assessment because the ALJ gave weight to some aspects of his opinion, but gave little evidentiary weight to the other aspects. (Doc. 22 at 13-14)

Dr. Masood, a state agency physician, conducted an examination of Plaintiff on December 5, 2006. (Tr. 228) He concluded that Plaintiff "would have difficulty in doing any meaningful extertional activity and it seems he is significantly impaired." (Tr. 229) Dr. Masood, however, did not identify any specific functional limitations. (Tr. 228-31) The ALJ assigned little evidentiary weight to Dr. Masood's evaluation. (Tr. 51) In so doing, the ALJ noted that, despite Plaintiff's alleged disabling impairment, he engaged in a wide variety of daily activities. (Tr. 49, 52, 108-11); *Rollins*, 261 F.3d at 856 (finding that ALJ properly rejected a physician's opinion where it was inconsistent with the claimant's activity level). The ALJ also noted that Plaintiff demonstrated normal muscle strength and sensation, with no evidence of muscle atrophy. (Tr. 51-52, 225, 229)

Additionally, Plaintiff does not explain how Dr. Masood's statement that Plaintiff

would have difficulty performing "meaningful extertional activity," is inconsistent with the ALJ's finding that Plaintiff could perform a reduced range of light work. Moreover, the ALJ noted that Dr. Masood reported a number of circumstances which were inconsistent with a finding of chronic long-term pain. (Tr. 52)  Additionally, the ALJ's RFC determination took into account Dr. Masood's finding that Plaintiff was unable to squat (prohibitions on crouching, squatting, Tr. 52), and had diminished right shoulder movement ("no use of his upper extremities for work about the shoulder level."). (Tr. 52)  The Court finds no error regarding the ALJ's assessment of Dr. Masood's opinion.

**E. Ms. Johnson and Mr. Giles**

Plaintiff next argues that the ALJ erred by finding that the opinions of a nurse practitioner and a physician's assistant are entitled to the same "evidentiary weight as the statements and opinions of the claimant's wife, children, and other laymen." (Tr. 50) Medical sources not listed as "acceptable medical sources" are important parts of an evaluation and their assessments should be carefully considered in part of making a decision. SSR 06-03p, 2006 WL 2329939, at * 2 (2006). In some cases, it may be appropriate to give more weight to "the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source." *Id*.

Social Security Ruling 06-03p provides that these "other medical sources, such as nurse practitioners and physician's assistants . . ." have gained increased importance in the evaluation of a patient. *Id.*  As a result, their opinions "should be evaluated on key issues such as impairment severity and functional effects . . . ."  *Id.*  Pursuant to SSR 06-03p, although nurse practitioners and physician's assistants are listed alongside laymen under "other sources," the SSA does not intend their opinions to automatically be given the same weight. Rather, the opinions from other medical sources should be given appropriate weight in each case.

Here, the ALJ erred by automatically considering Ms. Johnson's opinion as no more significant than lay opinion. Ms. Johnson was the first practitioner to assess Plaintiff,

- 20 -

she ordered diagnostic testing that revealed his injuries and referred him to the appropriate medical professionals for further evaluation. She had a long history of treating Plaintiff. She met with Plaintiff frequently, and was consistent in her opinion, which was supported by Plaintiff's claims as well as other medical opinions. Thus the ALJ erred by automatically rejecting Ms. Johnson's opinion. However, that error was harmless.

Ms. Johnson opined that Plaintiff could not lift more than 20 pounds, stand for "long periods," or engage in over the head movements." (Tr. 189) Ms. Johnson also opined that Plaintiff should not return to his past work at a warehouse - which required lifting and carrying boxes weighing nearly 100 pounds. (Tr. 157-58) Although the limitations found by Ms. Johnson would preclude Plaintiff's past warehouse work, they are consistent with the ALJ's finding that Plaintiff retained the capacity to perform a range of light work that permitted a change in positions, but did not require work above his shoulder level. (Tr. 49) Thus, any error in assessing Ms. Johnsons' opinion was harmless.

Likewise, Plaintiff has not shown harmful legal error regarding Mr. Giles' opinion. Mr. Giles did not provide any opinion regarding Plaintiff's functional limitations. Plaintiff argues, however, that Mr. Giles conducted an "extensive physical examination" of Plaintiff and his findings are "hardly irrelevant to a determination of disability." (Doc. 25 at 8) Plaintiff, however, does not identify any specific findings or opinions of Mr. Giles that the ALJ allegedly failed to assign a proper weight. Plaintiff bears the burden of showing legal error and has not carried his burden here. *Shinseki v. Sanders*, 556 U.S. 396 (2009) (noting that the burden of showing that an error is harmful normally falls on the party attacking the agency's determination.).

**F. Remand for Benefits**

Finally, Plaintiff argues that this matter should be remanded for an award of benefits. Having found no harmful legal error and the Commissioner's decision is supported by substantial evidence in the record, the Court will affirm the Commissioner's decision. Thus, the Court need not reach Plaintiff's argument regarding remanding for an award of benefits.

## VII. Conclusion

For the reasons set forth above, the Court finds that Commissioner's decision is supported by substantial evidence and is free from harmful legal error. Accordingly, the Commissioner's decision is affirmed. *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 885 (9th Cir. 2006).

Accordingly,

**IT IS ORDERED** that the Commissioner's decision denying Plaintiff's application for disability benefits is hereby **AFFIRMED**. The Clerk is kindly directed to terminate this action.

Dated this 8th day of August, 2011.

Lawrence O. Anderson
United States Magistrate Judge